STATE OF NEW YORK
COUNTY OF ORANGE

-------------------------------------------------------

ERIC K. MERRING,

                                    Claimant,

                -against-

THE TOWN OF TUXEDO POLICE DEPARTMENT
And the TOWN OF TUXEDO,

                                    Respondents.

-------------------------------------------------------

DATED:      June 6, 2007
            Poughkeepsie, New York
            10:15 a.m. - 12:01 p.m.


            Jennifer Cea, Reporter


                EXAMINATION OF ERIC K. MERRING
                HELD PURSUANT TO SECTION
                50-H OF THE GENERAL
                MUNICIPAL LAW


                Mary T. Babiarz Court Reporting Service, Inc.
                        (845)  471-2511

1

2

2          APPEARANCES:

3

4

5          LEE DAVID KLEIN
           Attorney for Claimant
6          11 Market Street, Suite 204
           Poughkeepsie, New York 12601
7

8
           HODGES, WALSH & SLATER, LLP
9          Attorneys for Respondent
           75 S. Broadway, Suite 415
10         White Plains, New York 10601
           BY: JOHN J. WALSH II, ESQ.
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

MERRING

3

ERIC K. MERRING, the Claimant herein, having been

first duly sworn by a Notary Public within and

for the State of New York, was examined and

testified as follows:

BY MR. WALSH:

Q    Would you please state your full name for the
record.

A    Eric K. Merring.

Q    Where do you reside?

A    343 Bob Holloway Road, Delancey, New York  13752.

Q    Good morning, Mr. Merring.  John Walsh is my name.
I'm representing the Town of Tuxedo in this matter.
I'm going to be asking you some questions about a
Notice of Claim you filed.  If I ask you any
questions you don't understand, please let me know
and I will attempt to rephrase the question so that
you do understand.  Do you understand that?

A    Sure.  Absolutely.

Q    How long have you lived in Delancey, New York?

A    A significant amount of time, over 20 years.

Q    And have you always resided at 343 Bob Holloway

MERRING

4

```
 1                  Road?

 2   A       Yes.

 3   Q       Have you had any interim addresses  over  the 20 years

 4           where you lived elsewhere?

 5   A       Yes.

 6   Q       Where was the last place you lived?

 7   A       The most recent?

 8   Q       Yes.

 9   A       504 Old Mill Road.

10   Q       Where is that?

11   A       Southfields, New York.

12   Q       And do you presently reside at 504 Old Mills Road in

13           Southfields?

14   A       I do not have a lease, if that's what you mean.

15           It's my girlfriend's apartment.   That's my

16           girlfriend's apartment.

17   Q       What is your girlfriend's name?

18   A       Regina Blecher, B-L-E-C-H-E-R.

19   Q       So how long have you been staying with Regina?

20   A       A little more so now, because I have a newborn son,

21           but roughly --- it's hard to say --- roughly, I

22           don't know, a half year, I guess, I don't know.

23   Q       How about before you moved in with Regina, where

24           were you living?
```

Mary T. Babiarz Court Reporting Service, Inc.
(845) 471-2511

MERRING

2    A    My father's address, 1 Amherst Road.

3    Q    Is that also in Delancey?

4    A    No, that is in New City, New York  10956.

5    Q    That is your father's house, you said?

6    A    Yes.

7    Q    What is your father's first name?

8    A    Kenneth.

9    Q    Can I have your date of birth, please?

10   A    

11   Q    Your Social Security number?

12   A    

13   Q    Are you presently employed?

14   A    Yes.

15   Q    By whom are you employed?

16   A    Davis Sports Shop, Sloatsburg, New York.

17   Q    Do you have an immediate supervisor there at the

18        sports shop?

19   A    No, just the owner, Wayne Davis.

20   Q    What do you do for Davis Sport Shop?

21   A    I'm a gun sales associate.

22   Q    How long have you worked there?

23   A    Since last September of '06.

24   Q    Did you have another job before going to Davis

25        Sports Shop?

Mary T. Babiarz Court Reporting Service, Inc.
(845) 471-2511

1                                MERRING                              6

2    A    Sure.

3    Q    What was that, the last one before that?

4    A    I was a car salesman for Harriman Chevrolet Cadillac

5         in Harriman, New York.

6    Q    How long did you work in Harriman Chevrolet?

7    A    I don't remember exactly.  Roughly around three,

8         four months.

9    Q    I'll take you back one more job before that?

10   A    Then I worked for Dorson Environmental Management.

11   Q    D-O-R-S-O-N?

12   A    D-O-R-S-O-N.

13   Q    Environmental Management?

14   A    Yes.

15   Q    What did you do for them?

16   A    I was an environmental consultant.

17   Q    How long did you work there?

18   A    Roughly --- it was a consulting job --- only about

19        two months.  Maybe closer to three months, closer to

20        three months.

21   Q    Do you have some type of experience or training in

22        environmental consulting?

23   A    Sure; that's what I went to school for.

24   Q    Do you have a degree?

25   A    Yup.  I have a BA from Binghamton University,

1                                    MERRING                              7

2              environmental  science,  animal  biology  minor.

3    Q        When  did  you  get  that?

4    A        In 1995.

5    Q        Apart  from Dorson,  have  you  worked  anywhere  else  in

6             the environmental  field?

7    A        Absolutely.

8    Q        Can  you  tell  me  where  else?

9    A        Prior  to  that  I  worked  for  a  company  called  Nature

10            Technologies.   They  were  based  in Pleasantville,  New

11            York.

12   Q        What  does  an environmental  consultant  do exactly,

13            just  curious?

14   A        I was  consulting  for  insurance  company  --- well,

15            through  insurance  companies  indirectly,  for  leaking

16            tanks  in houses  and  dwellings.

17   Q        Oil  tanks?

18   A        Oil  tanks.   And  testing water,  soil  and  so  forth,

19            and  if  it  led  to  an  impacted  site,  we  would  have  a

20            subcontractor  come  in and  excavate  the  property.   I

21            had  to  oversee  that.

22   Q        Where  was  Dorson  Environmental?

23   A        They  were  Elmsford,  New  York.   They  were  located  out

24            of  Elmsford,  New  York.

25   Q        What  is  the  reason  you  got  out  of  the  environmental

2          consulting  business?

3    A    Not much money in it.

4    Q    That is a good reason as any.  You say you have a

5          newborn  baby?

6    A    Urn-hum.

7    Q    Congratulations .. A boy or a girl?

8    A    A little boy.   /

9    Q    Do yoh ~ve  any other  children?

10   A    Yes,  I have a nlne-year-old  boy  from my --- well,

11        now divorced  wife.

12   Q    And  then when was  the new baby born?

13   A    November  6, 2006.

14   Q    And  I'm sorry,  is that a boy or girl?

15   A    Little  boy.  Two boys.

16   Q    So you have  been  through  a divorce  process.   Have

17        you been  involved  in any other  legal,  civil  legal

18        proceedings?

19   A    Civil,  explain  civil.

20   Q    As opposed  to criminal,  have  you been  in any other

21        lawsuits  apart  from  the divorce  proceeding?

22   A    As an injury.  I was  injured  when  I worked  at a

23        previous  job,  if that's what  you mean.

24   Q    So you brought  a lawsuit  against  somebody  for

25        personal  injuries  that  you suffered  while  you were

1                                    MERRING

2                working?

3    A        Yes.

4    Q        When did that injury take place, the accident?

5    A        October 24, 2002.

6    Q        And is that lawsuit resolved?

7    A        It's still pending.

8    Q        Do you have an attorney in that lawsuit?

9    A        I do.

10   Q        Who is that?

11   A        Patrick Benn, located in Manhattan, New York.

12   Q        Spell the last name?

13   A        B-E-N-N.

14   Q        Is he with a firm?

15   A        Yes.

16   Q        Do you know the name of the firm?

17   A        One moment; Estrin, E-S-T-R-I-N and Benn, B-E-N-N,

18            LLC.  Do you need the address?

19   Q        If you have it.

20   A        225 Broadway, New York, New York.

21   Q        Is that lawsuit pending in New York City?

22   A        Rockland County.

23   Q        Just generally, what part of your body did you

24            injure in that accident?

25   A        Left foot.

2    Q    Do you have a trial date on that?

3    A    Pat has not told me that information yet.

4    Q    Who is the defendant?

5    A    I don't know his name.  It's a construction  firm.

6    Q    Do you know who the defendant's attorney is?

7    A    Negative.

8    Q    Have you been through depositions in that matter?

9    A    Yes, I have.

10   Q    Have you ever been through a deposition before  apart

11        from today and the one in the personal  injury

12        lawsuit?

13   A    No.

14   Q    I understand  this matter stems out of an arrest  that

15        occurred on December 4, 2006; is that correct?

16   A    Correct.

17   Q    Had you ever been arrested before December  4, 2006?

18   A    Negative.

19   Q    Had you ever received any speeding tickets or other

20        violations  prior to December 4, 2006?

21   A    Received  just a ticket or convicted of speeding?

22   Q    Start with having gotten a ticket?

23   A    Absolutely.

24   Q    We all have.

25   A    Absolutely.  Throughout college, absolutely.

1

2   Q    And have you ever pled guilty or been convicted of a
3        traffic violation?

4   A    Lower than speeding, yes.

5   Q    So you pled down to something?

6   A    Sure.

7   Q    And prior to December 4, 2006, had you ever received
8        any other tickets from any members of the Town of
9        Tuxedo Police Department?

10  A    I did.

11  Q    On how many occasions?

12  A    At least one.  I believe it was one.  No, I'm sorry,
13       two.  That's right, it was two.  It was two.

14  Q    And do you know the names of the police officers who
15       gave you those tickets?

16  A    One of them was Officer Williams.  Do you need to
17       know what the ticket was for?

18  Q    Okay, what was it for?

19  A    I was charged with aggravated unlicensed or sus _
20       driving with a suspended license when my license was
21       not suspended.

22  Q    So were you able to resolve that when you went to
23       court?

24  A    It was dismissed, and rightly so.

25  Q    Have you ever had your driver'S license suspended?

Mary T. Babiarz Court Reporting Service, Inc.
(845) 471-2511

MERRING

2    A    Never.

3    Q    Do you know why it was that Officer Williams

4         believed you had your driver's license suspended?

5    A    I do not know, nor did my attorney at the time.

6    Q    Were you pulled over for some other violation and

7         showed your license and then got the unlicensed

8         violation?

9    A    I must have been.  I really don't remember what it

10        was for, though.

11   Q    Do you remember about when that was, you got pUlled

12        over?

13   A    Give me one moment.

14   Q    Sure.

15   A    January 22, 2006.

16   Q    You're looking at a document of some kind?

17   A    Certificate of disposition.

18   Q    Can I see that, please?

19        BY MR. KLEIN:

20             Show it to him.

21        BY THE WITNESS:

22   A    (Handing)

23        BY MR. WALSH:

24   Q    Thank you.  Do you have any documents that would

25        indicate what the initial stop was for that led to

MERRING                                                    13

```
 2              the  aggravated  unlicensed   charge?

 3    A       Not  with  me.

 4    Q       But  you  paid  a  $100  fine  as  a  result  of  something  at

 5              the  time  the  aggravated   unlicensed   charge  was

 6              dropped;  is  that  right?

 7    A       Give  me  a  moment,  let  me  think  for  a  second.

 8    Q       Here,  you  can  look  at  the  document.

 9    A       I  do  remember  now.   I  do  remember.   He  did  pull  me

10              over  for  40  miles  an  hour  in  ---  45  in  a  40.

11    Q       And  you  paid  a  fine,  you  pled  to  stopping  on  the

12              pavement   or  something?

13    A       Correct.

14    Q       And  you  said  there  was  another  time  that  you  had

15              been  pUlled  over  prior  to  December  4,  2006  by  a

16              Tuxedo  police  officer?

17    A       Yes,  that  was  Officer  Delio.

18    Q       Do  you  remember  about  when  that  was?

19    A       Roughly,  it  was  warm  weather.   It  was  roughly  early

20              mid  spring,  maybe  early  summer.

21    Q       Do  you  have  any  documents  with  you  today  that  would

22              refresh  your  recollection  as  to  when  you  were  first

23              pulled  over  by  Officer  Delio?

24    A       I  do  not.

25    Q       Did  he  issue  a  citation  of  any  kind?
```

Mary  T.  Babiarz  Court  Reporting  Service,  Inc.
(845)  471-2511

1                              MERRING                        14

2    A     Yes, for cell phone.

3    Q     And were you using a cell phone at the time?

4    A     No, I was not.

5    Q     Did you plead guilty to anything as a result of the

6          mid-spring time that Officer Delio pulled you over?

7    A     I went before the jUdge --- well, I was at the

8          judge, and at the last moment then Officer Delio

9          offered the lowest he could go was parking on

10         pavement or something to that effect.

11   Q     Did you plead guilty to that?

12   A     I did.  I did.

13   Q     So we have then three times you have been stopped by

14         the Tuxedo police officers; is that correct, total?

15   A     Correct.

16   Q     And are you presently licensed to carry a firearm?

17   A     I am.

18   Q     When did you get your license to carry a ---

19         withdrawn.  When was the first time you became

20         licensed to carry a firearm?

21   A     It was April 1988.

22   Q     And what was your occupation at that time?

23   A     Student.

24   Q     At Binghamton?

25   A     No, at SUNY Delhi.  SUNY University of New York at

1                              MERRING                                    15

2                Delhi.

3    Q      Is there a reason why you felt it was necessary to

4           become licensed to carry a firearm?

5    A      I enjoy shooting sports. I enjoy hunting. It's a

6           great pastime.

7    Q      And was that out of Delaware County you received

8           that gun license?

9    A      Correct.

10          BY MR. KLEIN:

11              Let him finish the question.

12          BY MR. WALSH:

13   Q      Excuse my ignorance, do gun licenses require

14          renewals?

15   A      Not in Delaware County. Some counties do.

16          Westchester County is one example.

17   Q      Were you living in Delaware County as a result of

18          going to Delhi at the time you got that license?

19   A      I was living --- Delancey, it's really Delancey.

20          Delhi prior to that.

21   Q      Is Delancey in Delaware County?

22   A      Yes.

23   Q      Was there a form you had to fill out when you

24          applied for the gun license?

25   A      Yes.

2  Q    Is there any type of restriction on the number of

3       firearms you're allowed to own?

4  A    No.

5  Q    So one gun license and you can own all the --- I

6       guess it's a pistol permit; is that right?

7  A    pistol.

8  Q    Once you had a pistol license, it's your

9       understanding you can own as many pistols as you

10      want under one license?

11 A    Yes.

12      BY MR. KLEIN:

13           Off the record.

14

15           (OFF THE RECORD DISCUSSION)

16

17      BY MR. WALSH:

18 Q    Have you applied for supplemental permits since you

19      got your initial first license?

20 A    Yeah, because I have added pistols prior (sic) to

21      the first pistol, sure.

22 Q    Subsequent to the first pistol, every time you buy a

23      pistol, you have to get some kind of supplemental

24      purchase; is that right?

25 A    They call it a coupon, purchase order signed by the

1                                    MERRING                               17

2          judge.

3    Q     Is that fee so the state makes money?

4    A     $3.  I think it's the county.

5    Q     Do you have to fill out some kind of form every time

6          you apply for the supplemental coupon?

7    A     Actually, no.  I would just call the pistol clerk or

8          write a letter and she would send the coupons to me.

9    Q     Do you presently own a pistol?

10   A     Yes.

11   Q     How many do you presently own?

12   A     Exact number?

13   Q     I'll take a rough estimate.

14   A     Around 15.

15   Q     Do you own other firearms as well?

16   A     Hunting rifles, yes, and shotguns.

17   Q     And about how many hunting rifles do you own

18         presently?

19   A     Four.

20   Q     You said shotguns as well, how many shotguns?

21   A     Four.

22   Q     You do bow-hunting as well?

23   A     I do.

24   Q     November is a busy month for you, I guess.

25   A     Yes.

2    Q    Have you ever applied for a gun license in Orange

3         county?

4    A    No.

5    Q    Or in any other county other than Delaware County?

6    A    No.

7    Q    I understand as part of your claim that as a result

8         of the arrest of December 4, 2006, your pistol

9         permit was suspended; is that correct?

10   A    Correct.

11        BY MR. WALSH:

12             Mark that.

13

14             (ORDER SUSPENDING LICENSE RECEIVED

15         AND MARKED AS RESPONDENT'S EXHIBIT

16              A FOR IDENTIFICATION)

17

18   Q    I show you what we have marked as Respondent's A for

19        Identification for today's date and ask that you

20        take a look at that.  Is that the order suspending

21        your pistol permit served upon you following your

22        arrest on December 4, 2006?

23   A    That is such.  This is a copy of it, yes.

24   Q    Was that ever served upon you?

25   A    By mail, not in person.

                Mary T. Babiarz Court Reporting Service, Inc.
                          (845) 471-2511

2    Q    Have you received a copy?

3    A    Absolutely.   Yeah, by fax and by mail.

4    Q    As a result of receiving a copy, did you turn in

5         your pistols?

6    A    No, I did not.

7    Q    What did you do after you received a copy of this

8         order?

9    A    Well, my pistols are also co-owned by my father, so

10        through Mr. Klein, we respectively wrote the jUdge

11        for guidance, and no follow-up for surrendering

12        firearms to the state police was necessary.   They

13        were locked in my father's safe.

14   Q    So Mr. Klein wrote a letter to JUdge Becker; is that

15        right?

16   A    Yes, and/or spoke to him on the telephone.

17   Q    And as a result, the guns were then locked in your

18        father's safe?

19   A    Yes, I was stripped of my firearms.   I did not have

20        a firearm.   I complied with the full order from the

21        judge, and it remained so until the order was

22        vacated.

23   Q    When was the order vacated?

24   A    The exact date?

25   Q    Approximately.

1                                 MERRING                              20

2    A    Approximately  two, two-and-a-half  months  later.

3    Q    And at that point, were the guns  returned  to you?

4    A    At that point, I probably picked up maybe one of my

5         firearms  or something  at my father's residence.

6    Q    But you were allowed to pick up anyone  you wanted?

7    A    I --- correct.  Absolutely.  The license was back in

8         full force at that point.  Reinstated.

9    Q    So presently,  again, you are licensed  to carry

10        firearms;  is that right?

11   A    Correct.

12   Q    Just to make it clear, that license  was suspended

13        for approximately  two to two-and-a-half  months?

14   A    Correct.

15   Q    Okay, at the time that you were  initially pulled

16        over on December  4 of 2006, where  were  you coming

17        from?

18   A    I was coming  from Southfields,  New York.

19   Q    That would  be from your  girlfriend's  house?

20   A    Correct.

21   Q    And where  in Southfields  does  she live; whereabout

22        is that in relation  to say the Red Apple Rest?

23   A    Approximate  distance?

24   Q    South of it, north of it?

25   A    A little north of it, less than a half mile.

Mary  T.  Babiarz  Court  Reporting  Service,  Inc.
(845)  471-2511

MERRING

21

Q    Is it on the left side or the right side as you head north?

A    Left.

Q    And where were you going to at the time you were first pulled over on December 4?

A    I was driving to work at that    it was a Monday.

Q    So you were heading south?

A    Yes, on 17.

Q    And where were you on Route 17 when you first became aware that Officer Delio was trying to pull you over?

BY MR. KLEIN:

    Objection to the form.  He wouldn't know at that instant it was Officer Delio.  You're referring to knowing that a police officer was behind him?

BY MR. WALSH:

Q    It was Officer Delio who eventually pulled you over; is that right?

A    Correct.

Q    When was it that you first became aware that a police officer was pulling you over?

A    At what area?

Q    Yes.

1                                    MERRING                                    22

2    A      Like give a reference?  As a reference     it is

3           abandoned  now --- but there's  an abandoned

4           restaurant   called  the Duck Cedar  Inn, and he was

5           directly  across  the street  from there  apparently.

6           He wasn't  immediately  behind me for a short

7           distance,  but ...

8    Q      Did you see him pullout   of the parking  lot across

9           the street  from the Duck Cedar  Inn?

10   A      Vaguely.

11   Q      Did he have his lights  on as he came out?

12   A      No.

13   Q      Did he pull  in behind your  vehicle?

14   A      Not  immediately,  but, yes.

15   Q      How  fast were you traveling  when you first  became

16          aware  of the police  officer?

17   A      I wasn't  looking  at my speedometer.

18   Q      What  was your highest  rate of speed  on Route  17

19          before  you were pulled  over?

20   A      Could  you rephrase  that question?

21   Q      What  was your highest  rate of speed  on Route  17 that

22          morning  before  you got pulled  over?

23   A      Speed  limit, 55.

24   Q      And did Officer  Delio put on his lights,  his

25          overhead  lights?

2   A    When he was directly behind me, yes.

3   Q    Did *you* glance at your speedometer when *you* first
4        saw Officer Delio pullout?

5   A    *No.*

6   Q    Were *you* in the right lane or the left lane when *you*
7        first saw Officer Delio pullout?

8   A    **Left** .

9   Q    And from the time he put his lights on until the
10       time you pulled over, how much distance do *you*
11       figure you were traveling?

12  A    Roughly between a quarter of a mile to a half mile.
13       There was no real place to pullover  safely.

14  Q    Where did *you* pullover?

15  A    Stoneridge  Road.

16  Q    Was that on the right side or left side as *you*
17       headed south on 17?

18  A    Right side.

19  Q    So *you* didn't pullover  onto the shoulder of 17, *you*
20       pulled into a side street; is that right?

21  A    I had to, there was no safe road room.

22  Q    About what time of day was it?

23  A    9:00 a.m.

24  Q    After *you* pulled over, *you* eventually brought your
25       vehicle to a stop, is that right?

1                              MERRING                           24

2    A    Full stop.

3    Q    What kind of car were *you* driving at the time?

4    A    1987 Cadillac Fleetwood Brom.

5    Q    Do *you* remember what the weather was like that day?

6    A    Clear, no rain.

7    Q    Was it cold?

8    A    I should say snow.  No snow.

9    Q    Cold day?

10   A    I had a jacket on, so it must have been cooler.

11   Q    How far off 17 did *you* pull onto Stoneridge Road?

12   A    75, 80 yards.

13   Q    After *you* brought your vehicle to a stop, did *you*

14        remain in your vehicle until the police officer

15        approached your door?

16   A    Yes.

17   Q    How long after *you* brought your vehicle to a stop

18        did he approach you?

19   A    Less than a minute.

20   Q    Did *you* recognize the police officer?

21   A    I did.

22   Q    Again, Officer Delio?

23   A    It was.

24   Q    And how did *you* recognize him?

25   A    He had given me a ticket for a cell phone prior to

MERRING

1

2          that.

3   Q      And when Officer Delio approached your car, did you

4          roll down your window?

5   A      It was already down.

6   Q      And when he got to your window, who spoke, you or

7          the officer first?

8   A      He did.

9   Q      And what did he initially say?

10  A      I don't know the exact words, but it was    not

11         verbatim    You were speeding, I need to see your

12         driver's license, registration, and insurance

13         cards.

14  Q      Did you say anything to him in that initial

15         conversation?

16  A      I complied.  As I was reaching for my insurance

17         cards in my glove box, I immediately stated that I

18         was carrying my license and handgun on my right hip.

19  Q      So were you the first person to bring up the fact

20         you were carrying a weapon at the time?

21  A      Yes, I offered that information.

22  Q      Did he respond when you told him that?

23  A      Yes.

24  Q      What did he say?

25  A      "What valid reason do you have for carrying your

Mary T. Babiarz Court Reporting Service, Inc.
(845) 471-2511

1
MERRING
26

2              handgun on you right now?"

3    Q       And did you respond to that?

4    A       I did.

5    Q       And what did you say?

6    A       I said, "I have an unrestricted New York State

7            pistol license. I don't necessarily have to have a

8            reason to have it on me, but I happen to be going to

9            work behind the sales counter at Davis Sports shop."

10   Q       Did he respond to that?

11   A       Yes.

12   Q       What did he say?

13   A       "That's not a valid reason."

14   Q       Did you respond to him telling you he did not

15           believe your reasons were valid?

16   A       He repeated it.

17   Q       Did you say anything back to him in that regard?

18   A       I stated, again, that it is an unrestricted license

19           handgun, I'm allowed to have it on my person at any

20           time. At which time he made a cell phone call.

21   Q       So when he made the cell phone call, did he walk

22           away from the car?

23   A       He was right next to the car.

24   Q       Did he have your insurance, license and registration

25           when he made the cell phone call?

1

2    A    He had at least my driver's license and

3         registration.  I don't know if I even made it to my

4         insurance cards at that point.

5    Q    Did he ask you at any time for a copy of your pistol

6         permit?

7    A    Yes, at that point he did.

8    Q    Was that before he made the cell phone call?

9    A    After.

10   Q    First he made the cell phone call, then he asked for

11        the pistol permit?

12   A    In that sequence, probably.

13   Q    Were you carrying your pistol permit?

14   A    Of course.

15   Q    It was in your wallet?

16   A    Separate wallet.

17   Q    Did you hand it to him at that point?

18   A    The entire thing.  He had every piece of ID I had at

19        the time or just immediately after he was making

20        that cell phone call.

21   Q    I'm confused a little bit here.  It's probably me.

22        Did you give him the pistol permit before or after

23        he made the cell phone call, if you can recall?

24   A    I remember showing him, I don't know if he had it in

25        his physical hand at the time he was making the cell

28

1

2    phone call.  He may have.  I do know that at the

3    time soon after he had every piece of documentation

4    that I could provide.

5  Q    Sometimes we attorneys ask you to remember details

6    that we realize are impossible to remember.  If you

7    don't recall, please feel free to tell me you don't

8    recall.

9  A    That's fine.

10  Q    What was the tone of this conversation you had with

11    Officer Delio?

12  A    His tone or mine?

13  Q    Let's start with his tone?

14  A    Very angry.  Initially as he came up to the door,

15    very angry.

16  Q    Your tone?

17  A    Very calm, collected.

18  Q    Were you able to ascertain what it was that had

19    angered Officer Delio?

20  A    No.

21  Q    At the prior time that Officer Delio had pulled you

22    over, had there been any angry words exchanged?

23  A    I would say agitated.  I wouldn't say angry, per se.

24    I believe you're speaking about the cell phone?

25  Q    Right.

2    A    I believe  he probably  just maybe  had a bad morning

3         or something,  nothing piqued  my interest  as far as

4         being out  of the ordinary  that day.

5    Q    Was there a difference  generally  in the  tone of his

6         voice the second time he pulled you over as opposed

7         to the first  time?

8    A    Absolutely.

9    Q    What was the difference?

10   A    He was angrier.  He was already coming  to the car

11        mad when  I was pulled over on Stoneridge  Road.

12   Q    Have you ever discussed  Police Officer  Delio with

13        anyone else,  I mean,  generally  who may have known

14        him outside of the  --- (interrupted)

15   A    At the time of my arrest  or prior  to that?

16   Q    Since then?

17        BY MR. KLEIN:

18            Can  I interject,  are you asking  anytime  from

19                (interrupted)

20        BY MR. WALSH:

21   Q    Anytime  from the beginning  of time until  present,  a

22        part from with your attorney,  of course,  or any

23        attorney,  have you had any conversation  generally

24        about Officer  Delio with  friends,  acquaintances,

25        other people  who may know  him?

2   A      Oh, I did.  Regina, my girlfriend, he pulled my

3          girlfriend over too, and he was very, very --- well,

4          put it this way, he pulled behind her.  I don't

5          know, necessarily know if it was for a traffic stop

6          at that time, it might have been.  I don't remember

7          the exact details of her scenario, but I do remember

8          she was also very angry at him because he had a

9          sense of entitlement, and he rolled his eyes at her,

10         and she got extremely angry, and her words were to

11         the effect:  Don't you roll your eyes at me.  You're

12         a civil servant, I pay your salary, and if you

13         continue to do so, I have a long string of attorneys

14         in my family and I will sue you.

15  Q      What is her last name again?

16  A      Blecher.

17  Q      I'm just curious, who are her family members who are

18         attorneys?

19  A      I don't know all her cousins.  She has a ton of

20         cousins.

21  Q      Did Regina know Officer Delio outside of that

22         traffic stoP?

23  A      No, never.  Never.

24  Q      Anybody else you have ever spoken to about Officer

25         Delio?

1

2   A    Not specifically Officer Delio.  I have spoken to

3        state troopers about Tuxedo police officers, not

4        specifically him.

5   Q    Did you overhear the phone conversation  Officer

6        Delio had while he was standing outside your car on

7        December 4, 2006?

8   A    It was inaudible.  I couldn't hear him, but took the

9        inference of who was called and what was said,

10       because about a minute later another police car

11       pulled up with his emergency lights flashing.

12  Q    Were you still in your vehicle when the other police

13       car pulled Up?

14  A    The entire time.

15  Q    How long after you were initially stopped did the

16       second police car pull up, about?

17  A    Less than ten minutes.

18  Q    Did you have a cell phone with you when you were

19       pulled over?

20  A    No.

21  Q    No?

22  A    No.

23  Q    And did you speak to the second police officer when

24       the second police officer arrived?

25  A    It was a sergeant.

2    Q    Do *you* know who it was?

3    A    I believe his name is Welch, Sergeant Welch.

4    Q    Patrick?

5    A    I don't know his first name.

6    Q    During the interim between the time the cell phone

7         call was made and Sergeant Welch appeared, what if

8         anything occurred at the scene?

9    A    As I remember, Officer Delio has all my ID and he

10        went back to his police car.

11   Q    When Sergeant Welch arrived, did he come directly to

12        *you?*

13   A    He went straight to the police car first, spoke to

14        Officer Delio in his patrol car, 15, 20 seconds, if

15        that, and then the sergeant approached my vehicle.

16   Q    Who spoke first, you or Sergeant Welch?

17   A    Sergeant Welch.

18   Q    What did he say initially?

19   A    "What valid reason do *you* have for having your

20        handgun on *you* right now?"

21   Q    And I assume *you* responded?

22   A    Same as I did to Officer Delio.  "I have an

23        unrestricted pistol license, New York State, and

24        don't have to have a specific reason for carrying as

25        some licensors do, restricted to hunting, camping

1                                    MERRING                                    33

2           fishing, hiking, informal target shooting.

3    Q    And how did Sergeant Welch respond to that?

4    A    I believe he asked again.  I believe he asked the

5           same question again.

6    Q    Did you give him the same response?

7    A    Same response.

8    Q    What was Sergeant Welch's tone in this initial

9           conversation?

10   A    Agitated.

11   Q    Did you know Sergeant Welch prior to December 4,

12          2006?

13   A    No, never saw him in my life, that I could recall.

14          Maybe I saw him in a bagel shop or something.

15   Q    You don't know him from Davis, for instance?

16   A    No, no never.  Nothing like that.

17   Q    Have you ever had any conversations with anyone

18          about Sergeant Welch?

19   A    Not specifically.  Like I said, prior to, I spoke to

20          a couple of state troopers about Tuxedo police

21          officers in general.

22   Q    After your initial conversation with Sergeant Welch,

23          what happened?

24   A    He did not ask anything about the initial stop, my

25          driver'S license or anything else.  It was strictly

1                                    MERRING                                34

2              about my handgun, back and forth several times, and

3              then he ultimately, after I would say between five

4              and ten minutes roughly, he asked me to step out of

5              the vehicle, and he opened the door.

6    Q    Was there any discussions apart from    I mean ---

7         withdrawn.  The two of you were there at your door

8         for five or ten minutes before he asked you to get

9         out of your car.  Were there any other conversations

10        other than the conversation of him inquiring as to

11        your handgun with you?

12   A    Where is the handgun?  You know, it's on my right

13        hip.  I had explained that to Officer Delio.  His

14        line of questioning was strictly, strictly channeled

15        into, you have a license, why did you have the

16        handgun on?

17   Q    It was limited to that?

18   A    He may have asked, you know, where you're going, you

19        know, what --- you know, and at that time

20        (interrupted)

21   Q    At some point it was Sergeant Welch who asked you to

22        get out of the car?

23   A    He told me to get out of the car.

24   Q    Did you get out of the car?

25   A    I opened the car door, he pulled the door open.  As

                Mary T. Babiarz Court Reporting Service, Inc.
                              (845) 471-2511

```
 1                            MERRING                        35

 2          I stepped out, he grabbed my arm, Place your hands

 3          on top of your --- or above you, which I did.  And

 4          he proceeded to frisk me immediately.

 5   Q      So did he actually take you by the arm and pull you

 6          out of the car?

 7   A      He didn't lift me out of the seat, but as I was

 8          getting out, he helped me, I should say.

 9   Q      Did he grab your arm?

10   A      Left arm.  I believe it was my left --- because my

11          right arm would have been blocked by the door, so he

12          sort of got me around my own door.

13   Q      I just want to know if there was physical contact

14          between the two of you as you were getting out of

15          the car?

16   A      Absolutely.

17   Q      Can you describe the physical contact between the

18          two of you as you were getting out of the car?

19   A      I just did.  As I was sitting up to get my leg out,

20          he grabbed me --- not bare arm, it was my leather

21          jacket.  He grabbed my arm as I was coming out.  I

22          don't even know if the door was closed at that

23          point.  The door may be open at that point.  He

24          asked me to raise my arms, which I did, and

25          immediately he was behind me starting to pat me down
```

1                           MERRING                      36

2              --- actually in front of me first, patting me down

3              through the inside of the jacket, down to my hips

4              all around.  He felt my handgun on my right hip and

5              proceeded to withdraw it from my holster.

6    Q    After you got out of car, he asked you to put your

7         hands over your head?

8    A    Immediately.

9    Q    And you complied?

10   A    Absolutely.

11   Q    And it was while your hands were over your head that

12        he patted you down?

13   A    Yes.

14   Q    Did he take your pistol from you at that time?

15   A    Once he felt the handgun, he removed it from my

16        holster.  At the time when he grabbed it, I said,

17        It's not loaded.  There is no bullet in the chamber,

18        just the magazine is full.  At that point he already

19        ejected the magazine and he held the slide back.

20   Q    So it was while your hands were up, he patted you

21        down, took your handgun, you tell him there is no

22        rounds in the chamber?

23   A    Correct.

24   Q    And at that point he'S holding the gun; is that

25        right?

1

2    A    At that point he's approximately behind my --- the

3         knee of my trunk.  I'm on the top of my car with my

4         hands on the roof of my car and he's in essence

5         emptying the gun.  It was not chambered, but the

6         magazine was fUll, and he held the slide open.

7    Q    So he ejected the magazine?

8    A    He ejected the magazine and then locked the handgun

9         in the open position.

10   Q    And your hands were, by that time, on the roof of

11        your car?

12   A    Yes, as I recall.

13   Q    Was there any other physical contact between you and

14        Officer Welch at the scene?

15   A    Yes, he then --- once he placed the handgun on my

16        trunk he proceeded to continue to pat me down,

17        frisked me, when he noticed in my right front pocket

18        a knife, and immediately upon grabbing the knife

19        pulled it out of my pocket.  He tried to open it by

20        shaking it, it did not open, and he said, Put your

21        hands behind your back, you're under arrest for

22        carrying a gravity knife, or a knife that could be

23        opened by centrifugal force.  And I complied.  My

24        hands were already behind my back.  He helped me,

25        quite physically, put my hands behind my back and

1                          MERRING                          38

2          proceeded to put handcuffs on me.

3               I asked immediately, What am I being charged

4          with?  He rattled a sequence of numbers, I don't

5          remember the numbers, and he said, "Criminal

6          possession of a weapon, fourth degree," as he's

7          grabbing the chain of the handcuffs, pushing me

8          towards Officer Delio's patrol car.

9    Q     Let's step back so I can take it a little more step-

10         by-step here.  While he's patting you down, he feels

11         a knife in one of your pockets?

12   A     Correct.

13   Q     Which pocket?

14   A     My right front pocket.

15   Q     You were wearing jeans?

16   A     Yes, denim jeans.

17   Q     Did he take the knife out of your pocket?

18   A     Yes.

19   Q     How big a knife is it?

20   A     The length?

21   Q     Closed?

22   A     Maybe four inches, three-and-a-half, four inches.

23   Q     How long was the blade?

24   A     The blade is probably three-and-a-half, four inches.

25   Q     And why was it that you were carrying a knife?

          Mary T. Babiarz Court Reporting Service, Inc.
                        (845) 471-2511

1                                   MERRING                                    39

2    A      It's my personal property.  I just had my knife with

3           me.  I always have my knife with me.  At Davis I

4           open boxes a lot.  I use it for that.

5    Q      You say he attempted to open the knife and it would

6           not open?

7    A      He attempted to open it by gravity or force, by

8           shaking it; it did not open as I recall.

9    Q      Was it a knife that you can flip open with a flip of

10          the hand?

11   A      No.

12   Q      Is there some kind of lock mechanism that keeps it

13          from opening that way?

14   A      It's not designed that way.  It is not a per se

15          centrifugal force or gravity mechanism.

16   Q      So to open the knife, it requires --- (interrupted)

17   A      Spring tension.

18   Q      To open the knife, it requires you use two hands?

19   A      If you trained yourself you could open it with one

20          hand if you chose to by sliding the blade with your

21          thumb.

22   Q      You would have to push it with your thumb to open

23          it?

24   A      I suppose you could use your index finger, it would

25          be clumsy, but the thumb would be the most common

1                              MERRING                           40

2          way to do it.

3    Q      Is there a button?

4    A      No button.

5    Q      Any kind of latch mechanism to keep it closed?

6    A      To keep it closed.  There is a mechanism, it is a

7           spring, in essence, it will lock open --- it locks

8           when it's completely opened.

9    Q      How about locked closed, is there anything that

10          locks it closed?

11   A      Other than spring tension, the force it takes to

12          actually --- for the spring to keep that blade down

13          into its handle, which is --- acts like a sheath.  I

14          don't know however many pounds of force it takes,

15          but it would keep it inside the handle.

16   Q      Let me ask you, is it a knife when you flip it you

17          can open it?

18   A      No.

19   Q      Did Officer Welch attempt to flip the knife open at

20          all at the scene?

21   A      As I remember, he did a few times.

22   Q      How many times?

23   A      At least twice, maybe three.

24          BY MR. KLEIN:

25              Sergeant Welch?

                 Mary T. Babiarz Court Reporting Service, Inc.
                             (845) 471-2511

2              BY THE WITNESS:

3    A     Sergeant.

4              BY MR. WALSH:

5    Q     Sorry, just so we're clear.  Two or three times

6          Officer Welch attempted to flip the knife open, he

7          was unable to do so?

8    A     As I can see.  You must understand, I'm facing this

9          way and he'S like right there (indicating).  This is

10         all a matter of seconds.  Out of my peripheral

11         vision, I could see him trying to attempt to open it

12         as soon as he had it in his possession.  Was it six

13         times, I doubt it.  It was between two and three, I

14         think so.

15   Q     Did he get the knife open that day in your presence?

16   A     I don't remember the blade actually being out in

17         front of me.  If he did, he did that when I was

18         already in the police car.

19   Q     Were the attempts to open the knife by Officer Welch

20         made before or after you were handcuffed?

21   A     Before, immediately before.  As I remember, he was

22         trying to open it while he'S stating the words that

23         "This is an illegal knife.  Place your hands behind

24         your back."

25   Q     You say that Officer Welch helped you place your

1

2    hands behind your back?

3   A   No, he grabbed both my arms and pulled them down to
4        my lower back.

5   Q   How would you describe the force he used when doing
6        that?

7   A   Enough to get the job done, but I wasn't resisting
8        either, so my muscles and arms were already in that
9        motion anyway.

10  Q   You did not resist when he attempted to handcuff
11       you?

12  A   Not one ounce.

13  Q   Okay.  At this point you would be standing next to
14       the car with your hands handcuffed behind your back;
15       correct?

16  A   For a matter of seconds, because at that point he
17       was already whisking me away by grabbing the
18       handcuff chain.  I would say lifting it a little
19       bit, and his other arm was pushing my leather jacket
20       in my back, pushing me towards Officer Delio's
21       police car.

22  Q   So how long were you handcuffed for before you were
23       put in the police car?

24  A   From the time I was handcuffed until I was placed in
25       the police car, two or three minutes.

1                                MERRING                                    43

2    Q    Was there any further conversation while you were

3         handcuffed before you were put in the police car?

4    A    I specifically stated two or three times, What am I

5         being charged with, on what charge?  He would rattle

6         off again the sequence of numbers and criminal

7         possession of a weapon, fourth degree.

8    Q    You understood that to be Penal Law section, the

9         numbers he was rattling off to you?

10   A    It must have been.  He wasn't speaking about federal

11        statute or any other state.  At this point in time

12        you must understand, I was in complete shock.

13   Q    Were you in pain of any kind?

14   A    The cuffs were very tight.

15   Q    So you were put in the back seat of Officer Delio's

16        vehicle; is that right?

17   A    Yes.

18   Q    Was there any other physical contact you had between

19        you and any other police officers at the scene that

20        you haven't told me about?

21   A    At the scene, no.  Once I was in the police car I

22        was incarcerated in the police car while they

23        illegally searched my car.

24   Q    Did you watch them search your car?

25   A    Right through the windshield.

```
 1                              MERRING                        44

 2   Q   Who was it who searched your car?

 3   A   Both men, both officers.

 4   Q   Did they find anything during the search of your

 5       car?

 6   A   They found a bunch of stuff.  One, they found an old

 7       stick.  Officer --- sorry, Sergeant Welch found that

 8       --- found an old stick by my passenger's  floor

 9       board, just a stick.

10   Q   Can you describe it for me?

11   A   A stick about, I don't know, 18 inches, maybe two

12       feet long, rounded.

13   Q   It had bark on it?

14   A   No bark, but it was unstained.  It was wood.  It was

15       wood.  It was like pine or something.

16   Q   I mean, when you say a stick, I mean something you

17       break off a tree?

18   A   Hit my tires with, you know, just a stick.  I'm not

19       going to say a machine, but a fabricated  stick.

20   Q   Did it have a handle of any kind?

21   A   Nothing, just wood.  Just a solid piece of wood.

22   Q   Was it carved in any way, anything like that?

23   A   I don't remember if it was smooth or if it had maybe

24       some fine groves, I don't remember.

25   Q   It was like a billy club-type  stick?
```

```
 1                            MERRING                          45
 2   A    What is a billy club?
 3   Q    Something you would use to hit somebody with?
 4   A    It was definitely not a legitimate police night-
 5        stick, if that's what you mean.  This had absolutely
 6        no weight.  It was realistically, it was --- I used
 7        it for hitting my tires.
 8   Q    You would hit your tires with this stick?
 9   A    Yeah, see how, you know.
10   Q    Was that the only purpose you used this stick for,
11        was to hit your tires?
12   A    Yeah.
13   Q    I'm just a little confused.  Do you typically carry
14        a stick around your cars to hit your tires with?
15   A    Sometimes  I carry rifles, shotguns, pistols.  A
16        stick is nothing.
17   Q    How long were you in Officer Delio's car before you
18        were driven from the scene?
19   A    There were other things that Sergeant Welch found
20        that he brought back to the police car.
21   Q    While you were in --- (interrupted)
22   A    Once he brought the stick back, he said, You're
23        being charged with this.  He threw it in the front
24        seat of the patrol car.  Then he came back again,
25        rifling through my stuff illegally, he went through
```

1

2      my hunting backpack.   There was probably some   _

3       just some, you know additional  clothing,  you know,

4       maybe  some hats, gloves or small stuff, but there

5       was one of my liquid containers was in the hunting

6       pack and he came back and said, What is in this

7       container?   It was a black plastic container.   I

8       said,  I don't know, water,  and it had sort of an

9       amber  orange color.   I said, Well, it's not urine,

10      maybe  it's iced-tea.   So then he closed the door and

11      went  back.

12  Q   What  was it, do you know?

13  A   Probably  iced-tea.   Probably  iced-tea.   I had

14      forgotten  it was in there.

15  Q   This  was  all at the scene?

16  A   Yup.

17  Q   At the  scene he brought  back  to you a container  of

18      liquid  of some kind, asked  you what  was it, you

19      responded  probably  iced-tea  and he poured  it out?

20  A   Right  in front  of me, yeah, poured  it right  there,

21      but he also specifically  asked me --- I don't  know

22      if it was at the exact  moment  of the iced-tea

23      incident  or just after, one of those  times  --- he

24      did specifically  open the door  and say, "So now what

25      is your  valid  reason  for having  a gun  on"?

2    Q    While you were sitting in the police car, he came

3         back to the car once again, opened the rear door of

4         the car?

5    A    The passenger's rear door, that's where I was.

6    Q    And again he inquired of you as to why you were

7         carrying a gun?

8    A    Yes.

9    Q    What did you say?

10   A    "This is a free country.  This is a free state.  I

11        have an unrestricted license to carry a handgun, I

12        don't need to have a reason to have my handgun with

13        me."  And he slammed the door.  Oh, no, before he

14        slammed the door, let me correct that.  "So what

15        you're telling me is you really don't have a valid

16        reason."  Then he slammed the door.

17   Q    So did they open your trunk, the trunk of your car

18        while you were at the scene?

19   A    All the doors were open and the trunk.  The only

20        thing not open was my hood.

21   Q    Did any other officers come to the scene while you

22        were still there apart from Officer Delio and

23        Sergeant Welch?

24   A    No.  No.  Just those two officers.

25   Q    Apart from your hunting pack and the stick and the

2        knife and the gun, did they find anything else in

3        your car?

4    A   There is a slew of stuff.  There could have been

5        there could have been a car seat, baby stroller.

6        There could have been a sun visor when I go to the

7        beach.  There is just, you know, jumper cables in my

8        trunk.  Probably, you know, a couple of quarts of

9        oil, just general.

10   Q   Did they remove any of these items in the car at the

11       scene?

12   A   What I could see, no.  The only thing they

13       specifically removed that they brought to my

14       attention was the stick and the hunting backpack.

15       Once the hunting pack was rifled through, that was

16       thrown back in the car.  Whether it was in the car

17       or trunk, I'm not sure where they put it.

18   Q   By hunting pack, is that like a backpack?

19   A   Backpack, camouflaged, made of fleece.

20   Q   How long were you in the back seat of the car before

21       you were driven away?

22   A   At least 15 minutes, maybe 20.

23   Q   Did you have any other conversations with Officer

24       Delio at the scene after Sergeant Welch arrived?

25   A   No.  No.  None.  At the scene?

1

2    Q    Right.

3    A    Right.  While we were in the police  car, that was

4         different.

5    Q    Let's make  it clear.  So at the  scene, after

6         Sergeant  Welch  arrived,  you had  no  further

7         conversation  with  Officer  Delio;  is that  correct?

8    A    *No.*

9    Q    That  is correct?

10   A    That's  correct.

11   Q    And  then  it was  Officer  Delio  who  drove  the vehicle

12        away  from  the  scene?

13   A    Yes.

14   Q    Was your vehicle  still  at the  scene  when  you  left?

15   A    Yes,  so was  my  handgun.

16   Q    And  the  stick  and  the  knife?

17   A    Correct.  Actually,  no,  just  the  knife.  The  stick

18        was  in Officer  Delio's  patrol  car  in  the  front.

19   Q    So when  you  left,  the  gun  and  the  knife  were  still

20        at the  scene,  but  the  stick  was  in Delio's  patrol

21        car;  is that  right?

22   A    Correct.

23   Q    Did you  see any  tow  trucks  arrive  while  you  were  at

24        the  scene?

25   A    *No.*

2   Q    And where did *you* go from the scene?

3   A    Officer Delio spun his vehicle around, and in a

4        matter of seconds as we're leaving, still in

5        complete shock, we were headed towards the police

6        department.   I was assuming, I didn't know, but I

7        was assuming we were going back to the Tuxedo Police

8        Department.

9   Q    Did *you* go back to the Tuxedo Police Department?

10  A    Yes.

11  Q    Directly from the scene *you* went to the Tuxedo

12       Police Department?

13  A    Yeah, I vaguely remember asking, What is going on

14       here; what am being charged with?  Officer Delio, I

15       believe, said --- reiterated, Criminal possession of

16       a knife, something like that.  He wasn't very

17       talkative.

18  Q    During the ride from the scene to the Tuxedo Police

19       Department, Officer Delio advised *you* *you* were being

20       charged with criminal possession of a knife?

21  A    Not in those words.  I may have said in --- not

22       verbatim, *you* know, What is going on here; what is

23       all this?  I believe he may have restated that it

24       was criminal possession of a knife.  I do remember

25       he did say --- I do remember he did say, I have your

1                               MERRING                                   51

2           pistol license up here.  I said, It's real.  He

3           said, I'm going to call; I'm going to call the

4           sheriff.  I said, Fine, call him.

5    Q      Did he make any --- (interrupted)

6    A      Not verbatim, but words to that extent.

7    Q      Did he make any phone calls while you were being

8           transported?

9    A      In the vehicle, no.  No.  No, he was driving.

10   Q      Were there any other conversations on the ride to

11          the Tuxedo Police Department that you recall?

12   A      Not that I could recall.

13   Q      When you got to the Tuxedo Police Department, what

14          happened?

15   A      He opened the door, Officer Delio opened the door.

16          I stepped out.  I remember I stated, I'm terribly

17          embarrassed, to which he did not respond.  He just

18          opened the building door, and escorted me up to the

19          office area.

20   Q      Did you see anybody you knew while you were still at

21          the scene?

22   A      Back to the scene now?

23   Q      Let's go back to the scene for a moment.  While you

24          were at the scene, did you see anybody you knew

25          apart from Officer Delio or Sergeant Welch?

1                                MERRING                        52

2    A    Knew as an acquaintence, or new as in

3          (interrupted)

4    Q    Anybody at all?

5    A    There was no one else there, just me, the sergeant

6          and officer.

7    Q    How long were you at the Tuxedo Police Department on

8          December 4?

9    A    Total time?

10   Q    Yes.

11   A    Over an hour. Over an hour. Probably closer to an

12         hour-and-a-half.

13   Q    Did you make any phone calls while you were at the

14         Tuxedo Police Department?

15   A    Yes, I was allowed to make phone calls, to which I

16         made the first two, and no one answered. I called

17         my girlfriend first. I called my father second.

18         There was no answer, so I hung up and I called my

19         girlfriend again and she picked up.

20   Q    What if anything did you tell her?

21   A    I told her I was arrested for carrying a pocket

22         knife, don't get upset. Immediately she started to

23         get upset.

24   Q    They can't help themselves.

25   A    I said I was in Tuxedo Police Department, I need

2        you to call my father and contact  an attorney.

3    Q   Did she agree  to do that?

4    A   She agreed to do that.  She was also going to come

5        down with my newborn --- our newborn.  I told her

6        not to do so.  And essentially it turned into me

7        calming her down and, you know, her trying to calm

8        me down, because  I wasn't really upset or anything,

9        I was just mad.

10   Q   So you were not feeling particularly  upset when you

11       were at the police  department?

12   A   I didn't feel great.  I was just arrested  for no

13       reason.

14   Q   She was more upset  than you were?

15   A   Absolutely.

16   Q   And did you speak to an attorney at any time while

17       you were at Tuxedo  Police  Department?

18   A   No, I did not.

19   Q   Did you call any attorney while you were at the

20       Tuxedo  Police  Department?

21   A   No, I only made that one phone  call.

22   Q   Did you speak to anyone else on the phone apart from

23       your girlfriend  while you were still  at the Tuxedo

24       Police  Department?

25   A   No.

MERRING

1

2    Q    Just the one phone call?

3    A    The first two did not go through.  I spoke to Regina

4         and that was the only one I spoke to over the

5         telephone.

6    Q    Do you know whether or not your girlfriend was able

7         to reach your father?

8    A    Well, the answer is she must have been, because he

9         was waiting for me after the scenario ended.  He was

10        waiting for me at the Tuxedo Police Department, so

11        she must have.

12   Q    So he picked you up; is that right?

13   A    Correct.

14   Q    Did you have any conversations with any police

15        officers while you were at the Tuxedo Police

16        Department?

17   A    Only us three in the office.

18   Q    The same three?

19   A    The same three.  As I'm on the phone, I  _

20        (interrupted)

21   Q    Let's work on this a little bit.  We have to try not

22        to speak over each other for her sake.

23   A    Sure.

24   Q    So while you were at the Tuxedo Police Department,

25        were there only two police officers there that day?

1

MERRING

55

2    A    Sergeant Welch arrived maybe ten minutes after
3         Officer Delio had me in the office.

4    Q    And did *you* see anyone else while *you* were in the
5         Tuxedo Police Department while *you* were released
6         apart from Sergeant Welch and Officer Delio?

7    A    I don't remember anybody else being there but us
8         three that I saw.  I did not see anybody else but us
9         three.

10   Q    Did *you* have any conversations with Officer Delio at
11        the police department before Sergeant Welch arrived?

12   A    I vaguely remember when I spoke to Regina, *you* know,
13        I may have been trying to calm her down a minute,
14        and I was trying to separate a little distance
15        between me and him.  And I remember him yelling, *you*
16        know, There is no privacy here, stand back in front
17        of me.  And in an angry tone again, as usual, same
18        as before.

19   Q    So let's just make this clear.  It's easier for me
20        if we have clear questions and responses on the
21        record.  While *you* were on the phone with your
22        girlfriend, *you* tried to step away a little bit to
23        have privacy and Officer Delio said, There is no
24        privacy here?

25   A    Maybe a quarter of a step, and then he said, No.

Mary T. Babiarz Court Reporting Service, Inc.
(845) 471-2511

1                              MERRING
                                                                  56

2          No.   No.   There is no privacy here, talk in front of

3          me.

4    Q     Were your handcuffs on at that point?

5    A     He removed them just prior to making the phone call.

6    Q     How long after you got to the police department did

7          he remove the handcuffs?

8    A     Moments.   Less than five minutes.

9    Q     Okay.   Apart from him telling you that there is no

10         privacy here, were there any other conversations

11         between you and Officer Delio before Sergeant Welch

12         arrived at the police department?

13   A     Other than after the phone call was made, I had

14         asked him if he wanted my extra mags or my gun belt,

15         he said, Yeah, I'll be taking those.   He didn't

16         immediately take them at that point.   I remember he

17         placed some stuff, whatever it was, on his desk or

18         someone's desk in the other office room.   I watched

19         him do that, probably my pistol license and maybe

20         some other stuff.   And then I remember he asked me

21         to sit down at the desk, and then probably at that

22         time Sergeant Welch had arrived.

23   Q     How many magazines were you carrying with yOU?

24   A     One in the gun, two on my belt.

25   Q     And how many rounds in a magazine?

2    A    Eight.

3    Q    24 total rounds then you had with you?

4    A    Yes.

5    Q    And what type of weapon was it?

6    A    It was a Kimber.

7    Q    Spell that?

8    A    K-I-M-B-E-R, stainless gold watch match 191145ACP,

9         which stands for automatic colt pistol.

10   Q    It was an automatic?

11   A    It was a semi-automatic.  There are no automatics in

12        New York State.

13   Q    No legal ones?

14   A    That is, that civilians can have anyway.

15   Q    After Officer Sergeant Welch arrived, did you have

16        any conversations with him?

17   A    Yes.

18   Q    At any time after you arrived back at the police

19        department, were the handcuffs put back on you?

20   A    No.

21   Q    Were you restrained in any other way while you were

22        at the police department; by that I mean by chains

23        or any other locking devices?

24   A    At that moment when Sergeant Welch arrived, no.  We

25        were --- I was at the desk.  We were at the desk, a

1

2          desk, with a computer on it, which had a wall

3          directly  in front of it.

4      Q   So you were sitting at a chair immediately adjacent

5          to a desk; is that right?

6      A   I'm at a chair, the desk is in front of me, computer

7          terminal  is here, and there is a wall right there

8          (indicating),  and Sergeant Welch is to my right at

9          his seat, and standing, and standing,

10         sitting/standing.

11     Q   Did the two of you have a conversation?

12     A   without me really asking, he brought over a black

13         book and I glanced at the title.  It did say Penal

14         Law, New York State.  And he opened a page, or had

15         it open to a page of Penal Law and he asked me to

16         read a paragraph, which I did.

17     Q   And you read it out loud?

18     A   I read it to myself.

19     Q   Did he ask you any questions about it after *you* read

20         it?

21     A   As I finished the paragraph, I specifically said,

22         That does not pertain to me, to which he responded

23         --- as he punched it    Yes, it fucking does; I

24         have been doing this for 11 years now, eight of

25         those years as a sergeant.

1

2   Q    Did you respond to that?

3   A    I was silent.  At that point I thought I was going

4         to be physically harmed.

5   Q    What was it that made you think you were going to be

6         physically harmed?

7   A    His demeanor, his tone, his physical aggression by

8         punching the book, his cursing.

9   Q    Did he touch you at all while you were at the police

10        station?

11   A    No.  When he led me to the jail cell, yes, he had

12        his hands on me.

13   Q    Other than that, did he strike you in any way?

14   A    No.  No.  He did not strike me, but I felt as if he

15        could have.  Remember, it was just us three in that

16        office.

17   Q    So how long were you sitting at this desk with

18        Officer --- with Sergeant Welch?

19   A    Probably around 15 minutes or so.  Maybe 20.

20   Q    Other than him showing you the Penal Law and the

21        conversation you had about the Penal Law, was there

22        any other conversation while you were seated at the

23        desk?

24   A    Less than five minutes after he had punched the book

25        and cursed, he had asked me to stand up.  He removed

MERRING

1

2       my gun belt, which had the holster  and the magazine

3       pouch  on it,  emptied  my pockets  of  some  cash,  my

4       wallet,  change,  my  little  Swiss  Army  knife  as  I

5       remember,  and  then  I'm going  to say  guided me,  he

6       was  behind  me,  sort  of  nUdging  me  from  behind  into

7       or  going  down  a  staircase,  going  towards  the  jail

8       cell.

9    Q    So  you  had  another  knife  in  your  pocket?

10   A    A  small  Swiss  Army  knife.

11   Q    How  big  was  that?

12   A    An  inch      well,  inch-and-a-half.

13   Q    Open  or  closed?

14   A    Closed.   The  blade  is  probably  an  inch  ---  maybe  an

15        inch  and  3/8  or  an  inch  and  a  half.    I'm  pretty  sure

16        it  is  the  smallest  one  they  make.

17   Q    After  he  emptied  your  pockets,  you  say  he  took  you

18        to  a  cell  of  some  kind?

19   A    Yes,  as  he'S  leading  me  to  the  cell,  I  remember

20        stating  to  him,  Is  this  absolutely  necessary?

21        Knowing  he's  going  to  put  me  in  the  jail  cell,  and

22        he'S  proceeding  to  open  the  bars,  the  door,  bar,  the

23        bar  doors  and  he  said,  Yes,  my  chief  is  in,  now  get

24        in.

25   Q    Did  you  go  in?

2    A    Yeah.  I did not resist, if that's what you mean.

3    Q    I just wanted to know if you walked in the jail
4         cell?

5    A    Yes.

6    Q    How big was it?

7    A    It didn't seem that much smaller than a college dorm
8         room.  I would say probably 10 X 10, maybe 10 X 12.

9    Q    Was there anything in it?

10   A    I remember the lights were off.  I remember being
11        --- it seemed dark.  No light really coming in other
12        than what was in the hallway.  Stainless steel bed.
13        I remember a stainless steel toilet and a bench
14        area, something like that.

15   Q    Anybody else in the cell?

16   A    No one.

17   Q    Did you have any conversation with anyone while you
18        were in the cell?

19   A    Sergeant Welch came back, at least once, maybe twice
20        prior to that, during that time while I'm in the
21        cell, stated some strange things, wanted to know yet
22        again, the laws and the procedures of not being
23        only having a pistol license, but obtaining a
24        pistol.

25   Q    He inquired of you what exactly, what did he say?

Mary T. Babiarz Court Reporting Service, Inc.
(845) 471-2511

**1**
MERRING
62

2    A    You're in the business, you must know more about

3          this than I do, so what happens, you know, with the

4          pistol license system?  So I, to the best of my

5          knowledge, tried to explain the pistol license

6          system whereas although it is a state license,

7          they're issued at county levels and each county has

8          their own set of rules or restrictions.  So I

9          remember giving him the example of Broome County,

10         New York, where it is as difficult to get a pistol

**11**     license there as it is in New York City.  To which

12         he absorbed that information and stated, Well, I

13         don't like the fact that you have a gun and that

14         you're with the NRA.

15   Q    How did he know you're with the NRA?

16   A    In my pistol license leather wallet, the pistol

17         license is on one face and on the other side is my

18         NRA card; obviously he went through that entire

19         wallet.

20   Q    And how did you respond when he told you he didn't

21         like the fact you were in the NRA?

22   A    I said, Well, you have a gun.  And he responded,

23         Yes, and I'm a good shot, to which I was silent,

24         because his tone was not of a recreational demeanor.

25   Q    What was his tone?

1

2    A    Nazi-like.   Authoritative.   Trying  to impress  upon

3         me by  intimidation  that  he has  a handgun  and he's  a

4         good  shot.

5    Q    How  long were  you  in the cell  for?

6    A    I would  say  roughly  20 minutes,  half  hour.

7    Q    Who  was  it who  came  to get  you  out  of the cell?

8    A    Officer  Delio  came  over,  had  some  other  forms,  you

9         know,  he wanted  to know my *eye*  color,  my  height  and

10        weight.   There  was  another      I don't  know  what

11        that  was  --- form,  but  he was  filling  some  paperwork

12        out.   He wanted  to go over  some  other  stuff.   He may

13        have  asked  my Social  Security  number  at  that  time,

14        I'm  not  sure.   And  then  once  he  left,  then  Sergeant

15        Welch  came  back  and  opened  the door,  the jail  cell

16        door.

17   Q    Was  the jail  cell  door  locked  when  you were  in it?

18   A    Yes.

19   Q    After  he opened  the jail  cell  door,  where  did  you

20        go?

21   A    He escorted  me up to an area  just  past  the desk

22        where  I was  sitting  for fingerprints  and

23        photographs.   They  took  a photograph  of me holding

24        up one  of those  black  cards  across  my chest,

25        proceeded  to fingerprint  me,  and  he explained  to me,

2          Just stay limp wrist, I'll do it.  So he did what he

3          had to do for the fingerprints, he did all that.

4          Once that was complete, he brought me to the

5          washroom to wash my --- ink off my hand, which I

6          did.  We came back and he compiled a packet of

7          something, and then he also had something on the

8          computer, which he sent to Albany, he said.

9    Q     He said he sent it to Albany?

10   A     I watched him do it.

11   Q     When you say he had a packet of something?

12   A     You know, papers.  Papers of what had just

13         transpired, stuff.

14   Q     Did he issue any type of citation?

15   A     At that moment, no.

16   Q     Did there come a time when he eventually issued you

17         a ticket of some kind?

18   A     Yes.  Yes.  At first he asked for bail.

19   Q     He asked you personally?

20   A     Yes.

21   Q     Let's go back.  How long were you at the police

22         department after you got out of the cell?

23   A     Total time?  At least 20 minutes.

24   Q     It's during that time that your fingerprints were

25         taken; correct?

1
MERRING

2   A       Yes.

3   Q       And certain other information was gathered and you
4           believe it was sent to Albany?

5   A       Right, photographed, fingerprinted, he had some
6           other forms and stuff was on the computer. Now, it
7           very well could have been the stuff that was in the
8           forms was already on the computer and he just
9           printed hard copy.

10  Q       And during that time also you had a conversation
11          regarding bail with Officer --- with Sergeant Welch?

12  A       Yes, once all that was complete. I was sitting back
13          at the desk, my hands already washed from the ink,
14          and he had indicated the lowest bail he could set
15          for is $100, so he handed me back my cash. I just
16          happened to have my cashed paycheck with me, and he
17          stated, I can't take it from you, because I'm on
18          video right now, so you have to hand me the $100.
19          So I took $100 out of my folded money I had and I
20          gave him $100, to which he gave me a receipt.

21  Q       After you received the receipt for the bail, what
22          happened?

23  A       Things were relatively quiet. He stood me up, he
24          asked me to put the stuff back in my pockets. I
25          remember at that time seeing my handgun either in

2         his hands or Officer Delio's hands, one of them had

3         it open, of course, slide back, locked.  I remember

4         him asking me to pick up my gun belt, and he

5         proceeded to    let me back up.  As I'm putting my

6         gun belt on, or near it, or had it, picking it up, I

7         remember  Officer Delio specifically  stating that I

8         was going 69 in a 55-mile-an-hour  zone, to which I

9         stated  something  to the effect of  I didn't  know  I

10        was  speeding, and he became  quite  agitated.

11  Q     When you say he became  quite  agitated,  what is it

12        that made you believe  that?

13  A     Yelling,  yelling again, Officer Delio, you know,

14        very authoritative,  very demeaning,  very arrogant  in

15        a mad,  loud tone.

16  Q     What  did he say?

17  A     "Get out of my office" , and he motioned  with his

18        **arm,** his right arm pointing  towards  ---

19  Q     How  long did it take him to tell you  to get out of

20        his office,  just a moment?

21  A     However  long it takes to say the sentence;  it was

22        probably  two or three  seconds,  I don't  know.

23  Q     In addition  to him telling you to get out of the

24        office,  after he got upset, did he say anything  else

25        to you?

1                         MERRING                        67

2   A    No.

3   Q    And did you get out of his office?

4   A    I was in front of Sergeant Welch at the time, so as
5        Sergeant Welch was behind me, he's escorting me down
6        from behind, down a small staircase  through a
7        doorway which led to the open area of the police
8        department, where I remember immediately  seeing my
9        father sitting down.

10  Q    After he told you to get out of his office, you left
11       the police department; is that correct?

12  A    Not on my own.  I was escorted by Sergeant  Welch.

13  Q    Was he touching you, Sergeant Welch?

14  A    If it was, it was light.  I had my leather  jacket
15       on.

16  Q    When you say escorted, he walked with you to the
17       exit?

18  A    Correct.  Correct, and behind me.

19  Q    So I'm clear, during the walk to the exit, did
20       Officer Welch touch you at all, Sergeant  Welch touch
21       you at all?

22  A    At one time he may have put his hand on my jacket as
23       he's just bringing me down.  Nothing  out of the
24       ordinary, if I understand the question  correctly.

25  Q    I'm just trying to figure out what physical  contact

2          there was again.  I'm just wondering if there was

3          physical contact between you and Sergeant Welch

4          after you walked out of the police department?

5     A    It seemed that he was at least a step behind me.

6     Q    When you got out in the public area of the police

7          department, your father was there?

8     A    Sitting down, as I walked towards him.

9     Q    What happened?

10    A    I saw --- my father stood up and he asked the

11         officer, What is going on here?  To which Officer

12         Welch --- Sergeant Welch did not say anything.  My

13         father didn't continue the conversation.

14    Q    He did not?

15    A    He did not continue the conversation.

16    Q    So did the two of you then leave the building?

17    A    Sergeant Welch at that point said, Your license

18         checks out.  He handed me my handgun back.  And he

19         said, Load that outside, to which I did not respond.

20         I just took possession of my handgun in the open

21         position, kept it in my hand, and I proceeded to

22         walk outside with my father.

23    Q    Did you load it after you got outside?

24    A    No.

25    Q    Does your father have a pistol permit?

1

MERRING

2    A    He does.

3    Q    Was he a police officer?

4    A    No.

5    Q    And have you had any conversation with your father

6         about what transpired while he was in the police

7         station before you came out?

8    A    Would you re-state that?

9    Q    Did you talk to your father about what went on while

10        he was there before you were brought out; did he

11        speak to anyone, anything like that?

12   A    If he did, I don't remember him saying.  Nothing

13        really stands out.  I remember maybe asking how long

14        he was waiting there, I don't remember what he said.

15        In essence, he was just sitting in the foyer area,

16        the main compartment area that leads up to the glass

17        desk.  There is a few chairs there.

18   Q    Did your father have a pistol permit while you were

19        growing UP?

20   A    Yeah, he did.

21   Q    After you left the police department, where did you

22        gO?

23   A    We went to go pick up my impounded car.

24   Q    Where was it?

25   A    At some point they must have    the paperwork they

1                                MERRING

2              gave me at least had an address where they had my

3              car.

4    Q         Where was it?

5    A         I'm not 100 percent, but I believe it's called

6              Tuxedo Auto Repair, or Tuxedo Auto.  It's a

7              collision place.  It almost shares the same parking

8              lot as the Red Apple Rest.  It's like one big lot.

9    Q         Half-mile down the road from the police department?

10   A         If that.

11   Q         *Okay,* did you have to pay anything to get your car?

12   A         Over $100.

13   Q         Do you remember how much it was?

14   A         Something, I remember like maybe 115, maybe 110  _

15             I think it was about 115 bucks.

16   Q         Did you then get your car when you paid him the

17             money?

18   A         I told him who I was, he said there's an impound

19             fee, and he made a phone call to somebody, whoever

20             that somebody was, maybe to verify that I didn't

21             just escape or something.  And he said, *Okay,* let's

22             get your car, but first I had to give him money.

23   Q         So you got your car?

24   A         I wrote a check for the money.  My father had his

25             checkbook, I wrote a check.

1
                                MERRING
                                                                        71

2    Q        How long were you at the impound place for?

3    A        Less than ten minutes.

4    Q        You got your car?

5    A        I did.

6    Q        Where did you go?

7    A        I spoke to my father for a few minutes, trying to

8             recollect what the hell just happened, and I went to

9             work.

10   Q        What time did you get to work?

11   A        I don't remember exactly.  It was before noon.  It

12            was some time between 11:00 and noon.

13   Q        So apart from that two hours or three hours, did you

14            miss any other time from work as a result of this

15            arrest?

16   A        No.  No.  That was --- I went straight to work after

17            I picked up my car.

18   Q        You worked the whole day?

19   A        Yeah, I worked until 4:00 that day.  That is my time

20            to work until, because then I had to pick up my son

21            from school.

22   Q        Does your son live with you?

23   A        Part-time; we have joint custody.

24   Q        What was your first wife's name?

25   A        Linda Petty, P-E-T-T-Y.

2  Q    So where does your son live when he's not with *you?*

3  A    I don't remember at that time if she --- I had to

4       drive to pick him up somewhere, she must have been

5       --- I believe she --- it may have been in the

6       interim. She was living with her brother in upper

7       Grandview, New York, at the foot of the Tappan Zee

8       Bridge, but she was courted by another man who lived

9       a few miles away, Sparkhill, New York.

10 Q    You went and picked up your son and *you* went home

11      with your son?

12 A    Well, after work, sure.

13 Q    You went to Southfields?

14 A    Well, at that time, because it is very difficult for

15      me to have any real time with him, drive all around,

16      so at that time, as I remember, I don't remember

17      being   I don't remember going to my father's, I

18      may have, I really don't remember, but I may have

19      gone to my father's after that, I'm not sure, *you*

20      know, picked him up from school and gone to my

21      father's residence. I don't remember really.

22 Q    You don't remember what *you* did after work after

23      picking up your son?

24 A    It was at that point I was trying to put a lot of

25      stuff behind me, I don't remember what I did with my

1                                    MERRING                              73

2            son other than just enjoy the time I had with him.

3    Q       Do you remember what day of the week this occurred?

4    A       Monday, it was the day after my birthday.

5    Q       Were you scheduled to work Tuesday?

6    A       Yes.

7    Q       Did you work Tuesday?

8    A       Yes.

9    Q       Did you suffer any physical injuries as a result of

10           this arrest?

11   A       No, other than --- something that would need medical

12           attention, do you mean?

13   Q       Well, let's start with that. Have you had any

14           medical attention as a result of injuries you

15           suffered following this arrest?

16   A       No. I mean, other than handcuffs being on tight or,

17           you know, just being bullied around, no.

18   Q       How about psychological injuries?

19   A       Yeah.

20   Q       Have you been treated for any psychological

21           injuries?

22   A       It completely shattered my trust in local police.

23   Q       Did you go for treatment for any psychological

24           problem?

25   A       No. No.

2    Q    Did there come a time when you appeared  in court as
3         a result  of the arrest?

4    A    Yes.

5    Q    When was your first court appearance  following  the
6         arrest  of December  4?

7    A    Originally  it was  scheduled  for the Christmas  week,
8         to which we, my attorney,  Mr. Klein  and I, changed
9         that, because  it was a busy week,  so that was
10        adjourned  until January  25, 2007.

11   Q    And did you go to court  on January  25?

12   A    I was present  with my attorney.

13   Q    And what  happened  in court  that day?

14   A    Mr. Klein  advised  me that  there  was  a lot of
15        background  investigation  that he did on his part and
16        that he was going  to see the assistant  DA once he
17        arrived,  Luke Bulville  (phonetic),  and that he was
18        going  to get the best possible  outcome.

19   Q    Did you overhear  any conversations  between  Mr. Klein
20        and Mr. Bulville?

21   A    No.

22   Q    Did you see anybody  you knew in court  that day apart
23        from Mr. Klein?

24   A    No.

25   Q    And how  long were  you  in court  that day?

1                                    MERRING                                    75

2    A    Total time, from the moment I arrived until the

3         moment I left?

4    Q    Yes.

5    A    It was over an hour.

6    Q    Was it two hours?

7    A    It was a full docket, but I remember us going up

8         pretty early.  I would have to say less than two

9         hours.

10   Q    And when you went up to the bench, what happened?

11   A    I was asked to come up, I was --- my name was called

12        by the judge.  I went up.  Mr. Klein was right next

13        to me, after which the charges were read by the

14        judge, and Luke Bulville had indicated immediately

15        that he was withdrawing the charges, the case was

16        ___ the charge for criminal possession would be

17        withdrawn or similarly dismissed, I would be

18        pleading to parking on pavement for the speeding

19        ticket.  And that was agreed to by my attorney, Mr.

20        Klein and myself.

21   Q    And did you plead guilty to parking on pavement?

22   A    I did.

23   Q    And did you pay a fine?

24   A    No.  We used the bail money that was already taken

25        from me by Sergeant Welch to apply to that.  I do

2       remember  I had to borrow  a couple  of dollars  from

3       Lee because  I was a couple  of bucks  short  because

4       they needed  some processing  fees.   It was like  102

5       or $103.

6    Q   So the fine  was about  100 bucks,  it was a few

7       dollars  in processing?

8    A   Yeah.

9    Q   Did you overhear  any conversations  between  Mr. Klein

10       and anyone  else while  you were  in the Tuxedo  court

11       that day?

12    A   No.

13    Q   Has Mr. Klein  showed  you any documents  concerning

14       the investigation  that he did prior  to your

15       appearing  in court?

16    A   He would  always  copy me on any remittance  that he

17       would  generate  from the company  who built  the knife,

18       the lawyers  for the company  who manufactured  the

19       knife,  other  documents  pertaining  to the

20       investigation.   There may have been  a copy sent to

21       me from Luke Bulville.   If it was,  it wasn't

22       anything  in detail.   Maybe  just explaining  the

23       scenario  and,  you know.

24    Q   Did you receive  correspondence  from the district

25       attorney's  office?

2    A    Not directly; anything I got was received by my
3         attorney, Lee Klein.

4    Q    Did you review any documents before you came in to
5         testify here today?

6    A    I did.

7    Q    What did you review?

8    A    I reviewed the Notice of Claim somewhat.

9    Q    You have a file in front of you, did you review all
10        the documents in front --- (interrupted)

11   A    Not every single page. I just looked through.

12   Q    Apart from the Notice of Claim, what other materials
13        did you review before testifying today?

14   A    My statement that I had --- (interrupted)

15   Q    That you had what?

16   A        written for the case.

17   Q    Who did you write that statement for?

18   A    My attorney. Lee Klein.

19   Q    Do you have that with you today?

20   A    I do.

21   Q    Can I see it, please?

22   A    (Handing)

23   Q    Did you review anything else besides the Notice of
24        Claim and statement you have just handed me?

25   A    The certificates of disposition.

```
1                              MERRING                          78

2    Q    We have already looked at those; is that correct?

3    A    I did.  You looked at one of them, yes.

4    Q    You have more than one certificate of disposition

5         with you today?

6    A    I do.

7    Q    What is the other one for?

     A    For aggravated unlicensed operation of a vehicle by

9         the Tuxedo police, which was dismissed because I was

10        never s~Rended  ever.

11        BY MR. WALSH:

12             Take that out too.  Mark this, please.

13

14             (STATEMENT RECEIVED AND MARKED

15             AS RESPONDENT'S  EXHIBIT  B FOR

16                  IDENTIFICATION)

17

18   Q    I show you what we marked as Defendant's  B for

19        Identification.  Just for the record, would you

20        identify that for me, please?

21   A    Identify the paper I just handed you?

22   Q    Yes, just tell us what it is?

23   A    This is my statement as to what happened  on December

24        4, 2006 at approximately  9:00 a.m. from start to

25        finish.
```

1                                MERRING                           79

2   Q    And, again, that is a document you reviewed before

3        you testified today; correct?

4   A    I did not read it word for word.

5   Q    But you reviewed it before you testified?

6   A    I just glanced over it.

7   Q    And then you had certificate of disposition

8        concerning the unlicensed operation of a vehicle;

9        may I see that?

10  A    (Handing)

11       BY MR. WALSH:

12            Mark that.

13

14            (CERTIFICATE OF DISPOSITION

15       RECEIVED AND MARKED AS RESPONDENT'S

16            EXHIBIT C FOR IDENTIFICATION)

17

18  A    I carry them in my car.

19  Q    We have marked as Respondent's Exhibit C for

20       Identification for today's date, that is another

21       document that you looked at before you testified

22       here today; is that correct?

23  A    I only looked at it when I was looking for the other

24       certificate of disposition.

25  Q    Anything else that you looked at before you

                Mary T. Babiarz Court Reporting Service, Inc.
                          (845) 471-2511

1                           MERRING                              80

2          testified  here  today  besides  Band   C  and  the

3          certificate  of  disposition  on  the  weapons  charge?

4    A     Right.   B, C, certificate  of  disposition  for  --_

5          (interrupted)

6    Q         weapons  charge?

7    A     For  the  weapons  charge.

8    Q     And  the  Notice  of  Claim?

9    A     The  Notice  of  Claim.

10   Q     Anything  else  you  looked  at  before  you  testified?

11   A     Other  than  my  letter  from  Lee  scheduling  the  50-H

12         hearing  for  today.

13   Q     Have  we  covered  everything  you  looked  at  before  you

14         testified?

15   A     Yes.   Yes.   That's  it.

16         BY  MR.  WALSH:

17             Why  don't  we  mark  the  other  certificate  of

18             disposition  as  D  if  we  could.

19

20                (CERTIFICATE  OF  DISPOSITION

21             RECEIVED  AND  MARKED  AS  RESPONDENT'S

22                EXHIBIT  D  FOR  IDENTIFICATION)

23

24         BY  MR.  WALSH:

25             Just  note  for  the  record,  we  have  marked  the

1                                MERRING                          81

2                 other certificate of disposition as

3                 Respondent's D for today's date that deals

4                 with the weapons charge.  Can I get copies of

5                 these?

6       BY MR. KLEIN:

7                 Sure.

8       BY MR. WALSH:

9                 Thanks.

10  Q   Okay, have you incurred any legal costs as a result

11      of the arrest?

12  A   Significant costs.

13  Q   Was Mr. Klein your only attorney in this particular

14      matter?

15  A   Yes.

16  Q   And what was his fee?

17  A   Total fee was --- well, it was over $100 for the

18      tow, for the impounding fees.

19  Q   I'm only asking for the --- (interrupted)

20  A   Just attorney's fee?

21  Q   Yes, just attorney's fee?

22  A   The attorney's fee was $4,000.

23  Q   Worth every penny.

24  A   When I say significant, significant for me.

25      BY MR. KLEIN:

Mary T. Babiarz Court Reporting Service, Inc.
(845) 471-2511

1

2          Wait for the question.

3     BY MR. WALSH:

4  Q  $4,000 is money to anybody.  So *you* had the legal

5     fee; correct?

6  A  Correct.

7  Q  You had the impoundment fee?

8  A  Right.

9  Q  And *you* had a fine?

10 A  Right.

11 Q  Any other expenses associated with this arrest?

12    BY MR. KLEIN:

13         For instance, losing time from work, dock in

14         pay.

15    BY MR. WALSH:

16         I already asked him if he lost time from work.

17         He said no.

18 A  Of course I lost --- I was supposed to be at work at

19    9:00.  I didn't get back until noon.  Three hours

20    there.

21    BY MR. KLEIN:

22         He wants to know docked pay.

23    BY THE WITNESS:

24 A  I did not get paid.  I missed the time.  I didn't

25    get paid for it.

1                              MERRING                                    83

2              BY MR. WALSH:

3    Q     How much were you getting an hour then?

4    A     $12 an hour.

5    Q     Another 40 bucks?

6    A     Roughly.

7    Q     Any other costs associated with this arrest,

8          expenses?

9    A     Other than the cost of driving up to see my

10         attorney, Lee Klein, taking time off for those

11         interviews and those meetings, which were several

12         that I could recall.

13   Q     How much time did you lose from work to consult with

14         your attorney?

15   A     Total?

16   Q     Yes.

17   A     Total time I would probably say a full day's pay, if

18         you encapsulate it into one time, maybe a little

19         more.

20   Q     How much do you figure that would be worth, 100

21         bucks?

22   A     Yeah, roughly.  Maybe a little more.  And then

23         gasoline coming up and down, tolls.

24   Q     Anything else you can think of?

25   A     I have not yet received my knife, so that is still

1

2    gone. I did not get that returned to me by the

3    police department, so that was over a $100 knife.

4 Q  What kind of knife was it?

5 A  They're high-end knives.  It is not a  _

6    (interrupted)

7 Q  I'm not questioning you.  I'm just asking what kind

8    of knife it was?

9 A  Very well made high-end knife.

10    BY MR. KLEIN:

11     Tell him what kind of knife.

12    BY THE WITNESS:

13 A  Specifically, it's a Spyderco, S-P-Y-D-E-R-C-O.

14    BY MR. WALSH:

15 Q  Like Spyderco?

16 A  Meaning Spyderco Company.

17 Q  And it cost about 120 bucks when you bought it?

18 A  Yeah.

19 Q  Did they still have the stick?

20 A  That was part of the agreement between Lee Klein and

21    the assistant DA, that it wasn't necessary for us to

22    retrieve that.

23 Q  So the police officers still have the stick and the

24    knife?

25 A  I don't know where it is.  They have my knife.

1

2      Somebody has my knife.

3  Q   Was the knife part of any agreement?

4  A   No.

5      BY MR. KLEIN:

6      Off the record.

7

8      (OFF THE RECORD DISCUSSION)

9

10     BY MR. WALSH:

11 Q   Do they still possess anything else of yours, the

12     police department, besides the knife that you're

13     aware of?

14 A   No.

15 Q   Has anybody ever advised you that they were aware of

16     the fact that you got arrested; did it appear in the

17     newspaper, anything like that?

18 A   That I'm aware of?  I'm not aware of that it

19     appeared in the newspaper at all.

20 Q   Did you talk to your employers about the arrest?

21 A   Of course.

22 Q   What was their view of the whole thing?

23 A   That the Tuxedo police are corrupt.

24 Q   They didn't hold it against you, your employers?

25 A   No, not at all.  Matter of fact, it was almost at

MERRING

1

2          the same time the owner Wayne Davis was on the phone

3          with me, because there must have been some advance

4          knowledge from my girlfriend Regina to his wife,

5          Terry, who was at the store, to say what had

6          happened, where I was. Getting      quickly me

7          getting to work I was surrounded by co-workers who

8          were supporting me, especially Wayne Davis on the

9          telephone saying, Call the NCRA and make sure you

10         get an NRA attorney, because it is very important

11         that you fight this.

12    Q    So your employers did not hold the arrest against

13         you; is that right?

14    A    No.

15    Q    Your co-employees did not hold it against yOU?

16    A    No, they know I'm not a criminal.

17         BY MR. WALSH:

18             Okay. I have no more questions. Thank you

19             very much.

20

21         (Continued on next page to include jurat)

22

23

24

25


              Mary T. Babiarz Court Reporting Service, Inc.
                           (845) 471-2511

MERRING

1

2          BY THE WITNESS:

3              Thanks.

4          BY MR. KLEIN:

5              Thanks.

6

7                                          X _____

8                                          ERIC K. MERRING

9

10    Sworn to before me this _d.)..o)_ day

11    of

12

13    X

14          NOTARY PUBLIC

15

16                        LEE DAVID KLEIN
                  No1ary Public, State of New York
17                Qualified in D~tche9SCounty
                  Commission Expires  Oct. 14,20_

18

19

20

21

22

23

24

25

1                              MERRING
                                                                    88
2           RESPONDENT'S   EXHIBITS  FOR  IDENTIFICATION

3

4      <u>LETTER</u>                      ITEM
                                                          PAGE
5

6      A              Order  suspending  license
                                                          18
7      B              Statement
                                                          78
8      C              Certificate  of disposition
                                                          79
9      D              Certificate  of disposition
                                                          80
10

1 1

12

13

14

15

16

17

18

19

20

21

22

23

24

25


           Mary  T.  Babiarz  Court  Reporting  SerVice,  Inc.
                           (845)   471-2511

1                           MERRING                          89

2    STATE OF NEW YORK

3                      ss.

4    COUNTY OF DUTCHESS

5

6         I, JENNIFER CEA, a stenotype reporter and

7         Notary Public within and for the State of

8         New York, do hereby certify:

9

10        That, ERIC K. MERRING, the witness whose

11        deposition is hereinbefore set forth, was duly

12        sworn by me, and that the transcript of said

13        deposition is a true record of the testimony given

14        by such witness.

15

16        I further certify that I am not related to any

17        of the parties to this action by blood or marriage,

18        and that I am in no way interested in the outcome

19        of this matter.

20

21        IN WITNESS WHEREOF, I have hereunto set my

22        hand this   m+'R     day of  J...\W...         2007.

23
                        *xt:t* ~
24
                      J~!n~CEA
25

Mary T. Babiarz Court Reporting Service, Inc.
              (845) 471 ..2511

1

2                          LAWYER'S   NOTES

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25